## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

CAMMIE WALKER,

                  Plaintiff,

      v.

NANA WORLEYPARSONS, LLC,

                  Defendant.        Case No. 3:11-cv-00089-SLG

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

Cammie Walker initiated this action against her former employer, NANA WorleyParsons, LLC (NWP) in Alaska Superior Court in April 2011.[1] The Complaint sought damages for interference with Ms. Walker's rights under the Family Medical Leave Act (FMLA), disability discrimination in violation of AS 18.80.220 and the Americans with Disabilities Act (ADA), interference with Ms. Walker's rights under the Employee Retirement Income Security Act (ERISA), violation of AS 23.05.140, intentional interference with contract, breach of contract and the covenant of good faith and fair dealing, and wrongful retaliatory discharge in violation of Alaska public policy.[2] NWP removed the action to federal court on April 25, 2011.[3]

On June 15, 2012, the parties filed a Stipulation Regarding Partial Dismissal of Plaintiff's Claims.[4] Pursuant to that stipulation, Ms. Walker's Fifth Cause of Action (Intentional Interference with Contract) was dismissed in its entirety, and Ms. Walker's

---

[1] Docket 7-1 at 2 (Compl.).

[2] Docket 7-1 at 2 (Compl.).

[3] Docket 1 (Notice of Removal).

[4] Docket 27 (Stipulation).

Sixth Cause of Action (Breach of the Covenant of Good Faith and Fair Dealing) and Seventh Cause of Action (Retaliatory Discharge) were dismissed to the extent these claims overlap with Ms. Walker's ERISA claim.[5]

Before the Court is NWP's Motion for Summary Judgment.[6]  Oral argument on the motion was held on November 8, 2012.

### FACTUAL BACKGROUND

Many of the facts are not substantially in dispute.  But the parties disagree on at least one critical issue:  what occurred on April 9, 2009.

Cammie Walker began working for NWP's Predecessor, NANA/Colt Engineering, LLC, as a Project Controls Specialist in 2003.[7]  The offer letter specified that Ms. Walker could work from a "remote site for 1-2 days per week and 3-4 days in the NANA/Colt Anchorage office."[8]  Ms. Walker indicated that she initially worked three days in the office and two days from her home in Willow, Alaska.[9]  Ms. Walker's job description included the following  tasks that involved working with others: (1) "Meets with others to determine status of various projects"; (2) "Coordinates information between departments . . ."; and (3) "Interfaces with client and team members to explain estimates

---

[5] Docket 28 at 1-2 (Order on Partial Dismissal).  The stipulation was silent with respect to the breach of contract claim in the Sixth Cause of Action, and that claim was not briefed in this motion.

[6] Docket 29 (Mot.).

[7] Docket 34-1 at 5 (Walker Dep. at 19-20); Docket 34-5 at 1 (Dep. Ex 2: Offer Letter).

[8] Docket 34-5 at 1 (Dep. Ex 2: Offer Letter).

[9] Docket 34-1 at 5 (Walker Dep. at 20).

and techniques used to derive these estimates."[10]  Ms. Walker acknowledged that her job duties included "face-to-face in-person meetings" and that "face time was an important . . . part of [her] job."[11]  Ms. Walker was the only employee in her position that was allowed to work from a remote site and given a flexible work schedule.[12]  She has acknowledged that she had attendance issues beginning in 2007 and continuing into 2008.[13]

In August 2004, Ms. Walker was diagnosed with fibromyalgia.[14]  She promptly informed her direct supervisor, Robin Krajnik, about the condition.[15]  In October 2004, Ms. Walker requested information from NWP's Human Resources (HR) representative, Wendy Osen, about the company's disability benefits.[16]  Ms. Osen responded with detailed information about long term and short term disability benefits as well as FMLA benefits.[17]  By 2007, Ms. Walker was spending approximately two days per week in the

---

[10] Docket 34-5 at 9 (Dep. Ex. 12: Job Description).

[11] Docket 29-1 at 37, 116-17 (Walker Dep. at 38, 287-88).

[12] Docket 29-1 at 23, 111 (Walker Dep. at 20, 279).

[13] Docket 29-1 at 38-39, 53-54, 60-68, 71-73 (Walker Dep. at 41-42, 67-68, 76-84, 87-89).

[14] Docket 34-2 at 2, 12 (Answers to Def.'s First Discovery Reqs.); Docket 34-5 at 12 (Dep. Ex. 34: 8/17/04 Progress Note from Advanced Pain Centers of Alaska).

[15] Docket 34-1 at 5 (Walker Dep. at 22).

[16] Docket 34-1 at 5-6 (Walker Dep. at 21-22); Docket 34-1 at 30 (Krajnik Dep. at 31-33).

[17] Docket 34-5 at 2-6 (Dep. Ex. 3: emails regarding benefits).

office and working the rest of her hours from home due primarily to her worsening physical condition.[18]

In October 2008, Ms. Krajnik informed Ms. Walker that she would be required to work full time in the office beginning in 2009. The parties present different recollections of the reason for this change. Ms. Walker indicates that Ms. Krajnik told Ms. Walker that the schedule change was needed "due to changes in the business climate."[19] Ms. Krajnik testified that by October 2008, Ms. Walker was having a hard time satisfying her two-day-a-week in-office schedule. After receiving client complaints about Ms. Walker's performance, Ms. Krajnik testified that the schedule change was intended to "help [Ms. Walker] to be successful and to learn the systems that we had in place at [NWP]."[20]

 On December 17, 2008, Ms. Krajnik emailed Ms. Walker to confirm that Ms. Walker would "be in the office full time starting January 5, 2009."[21] Ms. Walker responded, "I do not want to be in town full time. . . . I would like you to consider allowing me to work part-time after February . . . [b]ut if that is not possible then I will have to make 2/27/0[9] my last day."[22] Ms. Krajnik's supervisor, Michael Irmen, acknowledged that this proposal constituted a request for an accommodation.[23] But Ms. Krajnik testified that Ms. Walker's proposal to work part-time after February was not

---

[18] Docket 34-1 at 6 (Walker Dep. at 25); Docket 34-2 at 13 (Answers to Def.'s First Discovery Reqs.).

[19] Docket 34-1 at 20 (Walker Dep. at 270-72.

[20] Docket 34-1 at 33 (Krajnik Dep. at 79).

[21] Docket 34-5 at 14 (Dep. Ex. 37: 12/17/08 emails).

[22] Docket 34-5 at 13 (Dep. Ex. 37: 12/17/08 emails).

[23] Docket 34-3 at 5, 8 (Irmen Dep. at 35-37, 53).

satisfactory to NWP given its projects at that time. However, Ms. Krajnik recommended to her superior that Ms. Walker be permitted to work her current schedule with two days per week in the office until her last day of February 27, 2009.[24]

On January 6, 2009, Ms. Krajnik emailed Ms. Walker to confirm her resignation effective February 27, 2009.[25] Ms. Walker responded that same day that "I do not want to lose my job but there is no way I can physically be in the office every day." In this email, Ms. Walker indicated that she was gathering information about the Americans with Disabilities Act and she did not want to commit to resigning her position until after she met with her doctor.[26]

Ms. Krajnik responded by email dated January 12, 2009 that Ms. Walker would be accorded a "special schedule of four (4) days in the office," but added "[i]f you are unable to adhere to this special schedule I will again need to accept your resignation you submitted on December 17, 2008."[27] In this email, Ms. Krajnik also shared her "observations and concerns" with Ms. Walker's attendance, noting that some weeks Ms. Walker was "in the office one day a week or not at all" and that she had "not fulfilled the duties of a Project Controls Specialist."[28] Ms. Krajnik added, "the company has grown in its client base and complexity of projects and is adopting new project control systems in line with WorleyParsons requirements," and that it was "essential for the success of

---

[24] Docket 34-5 at 13 (Dep. Ex. 37: 12/2008 emails).

[25] Docket 34-5 at 16 (Dep. Ex. 38: 1/2009 emails).

[26] Docket 34-5 at 15 (Dep. Ex. 38: 1/2009 emails).

[27] Docket 34-5 at 15 (Dep. Ex. 38: 1/2009 emails).

[28] Docket 34-5 at 15 (Dep. Ex. 38: 1/2009 emails).

the implementation of these systems . . . that [Ms. Walker] be in the office four days a week."[29]

In an email dated January 19, 2009, Ms. Walker responded "I do not want, or intend to resign my position." Instead, she wrote that she was "requesting an accommodation to continue working from home 3 days per week for medical reasons per the American Disabilities Act."[30]

By email dated February 3, 2009, a NWP HR representative sent Ms. Walker information regarding available FMLA benefits that provided job-protected leave. The email also included links to information about disability benefits.[31] NWP subsequently mailed Ms. Walker a hard copy of the FMLA paperwork. Ms. Walker testified that she received this paperwork, but that she was "still pushing back pretty hard on the disability suggestions" at that time so she threw the paperwork away.[32]

On February 17, 2009, Ms. Krajnik and Mr. Irmen met with Ms. Walker and presented her with a Notification of Workplace Performance Probation Based on Poor Work Quality (WPP).[33] The WPP identified several concerns with Ms. Walker's work, including "[her] lack of availability to attend scheduled client meetings or project and missing team meetings."[34] Ms. Walker acknowledged some performance deficiencies,

---

[29] Docket 34-5 at 15 (Dep. Ex. 38: 1/2009 emails).

[30] Docket 34-5 at 17 (Dep. Ex. 39: 1/19/09 email).

[31] Docket 34-5 at 36-37 (Dep. Ex. 73: 2/3/09 email).

[32] Docket 29-1 at 129-130 (Walker Dep. at 306-07).

[33] Docket 29-1 at 119 (Walker Dep. at 293); Docket 29-9 at 3-5 (Ex. LLL: 2/17/09 WPP).

[34] Docket 29-9 at 3 (Ex. LLL: 2/17/09 WPP).

including attendance problems.[35]  The WPP contained an Action Plan that required Ms. Walker to "report to the NANA WorleyParsons' Anchorage offices to work a minimum of three days per work week so that [she] may meet in person with the project team, the client, the project manager and the Project Controls team."[36]

On March 9, 2009, Ms. Krajnik and Mr. Irmen met again with Ms. Walker and presented a revised WPP with minor changes.[37]  The revised WPP Action Plan included the same requirement that Ms. Walker work in Anchorage a minimum of three days per week.[38]

After the March 9 meeting, Ms. Krajnik arranged for Ms. Walker to meet with HR to review Ms. Walker's benefit entitlements, including FMLA and disability leave.[39]

On March 24, 2009, Ms. Walker sent Ms. Krajnik an email that indicated that she was meeting with her doctors and "looking into the option of taking disability" leave.[40]

Throughout this time, Ms. Walker testified that she did not change her schedule to work at the Anchorage office three days per week.[41]

On April 9, 2009, Ms. Krajnik and Mr. Irmen met again with Ms. Walker.  The participants have quite different recollections of what occurred at this meeting.

---

[35] Docket 29-1 at 70-71, 105-06, 108-09 (Walker Dep. at 86-87, 232-33, 263-64).

[36] Docket 29-9 at 4 (Ex. LLL: 2/17/09 WPP).

[37] Docket 29-1 at 120-21 (Walker Dep. at 295-96); Docket 29-9 at 7-9 (Ex. MMM: 3/9/09 WPP).

[38] Docket 29-9 at 4 (Ex. LLL: 2/17/09 WPP); Docket 29-9 at 8 (Ex. MMM: 3/9/09 WPP).

[39] Docket 34-1 at 23 (Walker Dep. at 298-301).

[40] Docket 34-5 at 31 (Dep. Ex. 57: 3/24/09 email).

[41] Docket 34-1 at 23 (Walker Dep. at 297-98).

According to Ms. Walker, she believed the April 9 meeting had been scheduled to discuss the revised WPP and the response she had made to it.[42] She recalls that at the beginning of the meeting, Mr. Irmen told Ms. Walker that her performance was no longer an issue and that the only remaining issue was Ms. Walker's schedule. He asked if she could change her schedule to be in the office three days per week.[43] Ms. Walker responded that she could not do so because she feared losing her job as a result of calling in sick too many days on that schedule.[44] Mr. Irmen then told Ms. Walker that she would be terminated unless she decided to go on disability leave.[45] Ms. Walker explained to Mr. Irmen that she had already seen the doctor and had filled out the disability paperwork, and that she would choose to go on disability over getting terminated.[46] According to Ms. Walker, Mr. Irmen replied "great," and then Mr. Irmen, Ms. Krajnik, and Ms. Walker decided her FMLA would start at noon the following day.[47] Ms. Krajnik and Ms. Walker then discussed which tasks needed to be reassigned and which tasks Ms. Walker could complete in the next 24 hours.[48] Then Ms. Walker "was sent back to [her] office to pick up my FMLA paperwork," and went to her office at the

---

[42] Docket 34-1 at 25 (Walker Dep. at 314-15).

[43] Docket 34-1 at 25 (Walker Dep. at 314).

[44] Docket 34-1 at 25 (Walker Dep. at 314-15).

[45] Docket 29-1 at 14 (Krajnik Dep. at 91); Docket 34-1 at 25-26 (Walker Dep. at 315, 318); Docket 34-3 at 9 (Irmen Dep. at 74).

[46] Docket 34-1- at 25-26 (Walker Dep. at 315, 318-19).

[47] Docket 34-1 at 26 (Walker Dep. at 318-19).

[48] Docket 34-1 at 26 (Walker Dep. at 318-19).

Dimond Center to retrieve it.[49]  She then returned to NWP's downtown office to hand in her FMLA paperwork to HR approximately two hours later.[50]  But when Ms. Walker tried to submit her paperwork, HR refused to accept it.  Ms. Walker was informed that she had already been terminated and going on FMLA leave or applying for disability benefits was no longer an option.[51]  Ms. Walker indicated she was "stunned."[52]  Ms. Walker was paid for a full day of work on April 9, 2009.[53]

NWP's evidence regarding the events of April 9, 2009, based on the testimony of Ms. Krajnik, Mr. Irmen, and Ms. Walker, is as follows:  Ms. Krajnik and Mr. Irmen met with Ms. Walker to inform Ms. Walker how important it was for her to be in the office three days a week.[54]  At the meeting, Mr. Irmen told Ms. Walker that if she would not agree to this requirement, NWP would have no other alternative but to terminate her employment.[55]  Ms. Walker responded that she could not change her schedule.[56]  Ms. Krajnik does not recall Ms. Walker saying at that meeting that the reason she could not work three days a week in the office was due to her health.[57]  Both Mr. Irmen and Ms.

---

[49] Docket 34-1 at 26 (Walker Dep. at 319-20).

[50] Docket 34-1 at 26 (Walker Dep. at 320).

[51] Docket 34-1 at 26 (Walker Dep. at 321).

[52] Docket 34-1 at 26 (Walker Dep. at 321).

[53] Docket 29-11 at 4-11 (Exs. CCCC, DDDD: Termination Paperwork).

[54] Docket 29-1 at 13-15 (Krajnik Dep. at 90-92).

[55] Docket 29-1 at 12-14 (Krajnik Dep. at 89-91); Docket 34-3 at 9 (Irmen Dep. at 74-76).

[56] Docket 34-1 at 25 (Walker Dep. at 314-15).

[57] Docket 29-1 at 14 (Krajnik Dep. at 91).

Krajnik testified that when Ms. Walker said she could not change her schedule, Ms. Walker was informed that she was terminated.[58] Ms. Krajnik testified that "[b]asically we were all in agreement that Cammie was terminated at that time."[59] But after that, Ms. Walker raised the issue of FMLA and disability leave and suggested that she had already turned in her FMLA paperwork to HR before the meeting.[60] Mr. Irmen testified that he then told Ms. Walker that the termination was in effect unless Ms. Walker had already submitted her FMLA paperwork to HR before the meeting.[61] Ms. Walker stated she needed to go back to her office at the Dimond Center to get some things.[62] Later that day, Ms. Walker returned to NWP's downtown office and attempted to give the HR staff some paperwork.[63] But HR staff explained to Ms. Walker that she had already been terminated and they could not accept her paperwork. Ms. Walker then signed a termination form and a termination checklist and left the HR office.[64]

The parties also dispute the quality of Ms. Walker's job performance. Ms. Walker asserts that she was a highly capable employee, and points to various letters and accolades from NWP's clients as well as performance and merit pay increases that she

---

[58] Docket 29-1 at 14-15 (Krajnik Dep. at 91-92); Docket 34-3 at 9-10 (Irmen Dep. at 74-75, 80).

[59] Docket 29-1 at 15 (Krajnik Dep. at 92).

[60] Docket 34-3 at 9 (Irmen Dep. at 75-76).

[61] Docket 34-3 at 10 (Irmen Dep. at 80-81).

[62] Docket 29-1 at 15 (Krajnik Dep. at 92).

[63] Docket 34-1 at 37 (Krajnik Dep. at 136-37).

[64] Docket 29-11 at 5 (Ex. CCCC: Termination Checklist and Form); Docket 29-11 at 16-17 (Ex. EEEE: Hunsuck Dep. at 52-53); Docket 34-1 at 26 (Walker Dep. at 321).

received.[65]   In contrast, NWP identifies many problems and complaints with Ms. Walker's work attendance and performance beginning in approximately 2007.[66]   In their briefing on this motion, each party has selectively focused on those aspects of Ms. Walker's job performance and attendance that support its position.

## *DISCUSSION*

**I.   Jurisdiction.**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

**II.   Analysis.**

### A. Summary Judgment Standard.

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The burden of showing the absence of a genuine dispute of material fact lies with the moving party.[67]   If the moving party meets this burden, the non-moving party must present specific factual evidence demonstrating the existence of a genuine issue of fact.[68]

---

[65] Docket 30-31 (Opp.) and references therein.

[66] Docket 29 at 5-8 (Mot.).   *See also* Docket 29-6 (Ex. RR: 1/10/09 email indicating client is "at my wits end" and reporting problems); Docket 29-6 (Ex. SS: 1/12/09 email indicating the "client is very frustrated with us"); Docket 29-6 (Ex. TT: 1/13/09 emails indicating errors in Walker's work). NWP also notes that Ms. Walker's art business was beginning to prosper during early 2009.

[67] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[68] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986).

When considering a motion for summary judgment, a court is to accept as true all evidence presented by the non-moving party, and draw "all justifiable inferences" in the non-moving party's favor.[69] To reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[70] Thus, in considering NWP's Motion for Summary Judgment, this Court is to accept as true the evidence presented by Ms. Walker with respect to what transpired on April 9, 2009.

In evaluating summary judgment motions on employment discrimination claims, the Ninth Circuit has "emphasized the importance of zealously guarding an employee's rights to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."[71]

## B. Claim 1: Violation of FMLA

Ms. Walker alleges that NWP interfered with her rights under the FMLA. That Act generally provides an eligible employee with 12 weeks of job-protected unpaid leave to address a serious health condition, and makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act.[72] In order to establish a prima facie case of interference, an employee must show that: "(1) [s]he was eligible for the FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [s]he was entitled to leave under the FMLA, (4)

---

[69] *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

[70] *Id.* at 248.

[71] *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) (internal citations omitted).

[72] 29 U.S.C. § 2615(a)(1).

[s]he provided sufficient notice of [her] intent to take leave, and (5) [her] employer denied [her] FMLA benefits to which [s]he was entitled."[73]  "In interference claims, the employer's intent is irrelevant to a determination of liability."[74]  To prevail on her claim at trial, a plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her."[75]

Both parties agree that when Ms. Walker was an NWP employee, she was eligible for the FMLA's protections.  But the parties disagree on whether Ms. Walker was an NWP employee when she requested FMLA leave.  NWP alleges that based on its version of events, Ms. Walker had already been terminated during the April 9, 2009 meeting before she sought FMLA leave later that same day.[76]  As the Ninth Circuit has held, the right to FMLA leave "obviously cannot be exercised after the termination of an employment relationship."[77]

Ms. Walker asserts that she was not terminated at the April 9, 2009 meeting, but rather, she indicated then that she would be requesting FMLA leave and her supervisors agreed to a plan for that leave to begin the next day.  She maintains she was still an employee when she attempted to submit her FMLA paperwork later that day, and in fact, she was "still on the NWP payroll through the close of business on April

---

[73] *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011) (citing *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)).

[74] *Id.* at 778.

[75] *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001).

[76] Docket 29 at 20 (Mot.).

[77] *Walls v. Centra Costa Transit Auth.*, 653 F. 3d 963, 965 (9th Cir. 2011) (citing *Smith v. Bell S. Telecomm., Inc.*, 273 F. 3d 1303, 1311 (11th Cir. 2001)).

9, 2009."[78]  Thus, Ms. Walker maintains "the jury reasonably could decide in Walker's favor that there was an interference with her FMLA rights."[79]

Ms. Walker's FMLA claim cannot be resolved by summary judgment.  Given the parties' conflicting versions of the events of April 9, 2009, there are genuine issues of material fact.  Ms. Walker has submitted sufficient evidence upon which a reasonable jury could conclude that she was still an employee when she attempted to turn in her FMLA paperwork, and that her attempt to do so was a negative factor in NWP's decision to terminate her at that time.  Certainly, NWP has presented a very different version of the events of April 9, 2009, but it has not demonstrated that it is entitled to summary judgment if Ms. Walker's version of the events is accepted as true, which is the applicable standard to apply for purposes of this motion for summary judgment.

## C. Claim 2: Disability Discrimination

Ms. Walker asserts disability discrimination claims under both federal and state law.  The American with Disabilities Act (ADA), 42 U.S.C. § 12112(a), provides "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment."  In order to determine if the plaintiff is a "qualified individual" under the ADA, "first, a court inquires as to the job's essential functions, after which the plaintiff must establish that she can perform those functions with or without reasonable

---

[78] Docket 34 at 22 (Opp.).

[79] Docket 34 at 21, 24-25 (Opp.).

Case 3:11-cv-00089-SLG   Document 45   Filed 01/28/13   Page 14 of 23

accommodations."[80]    Reasonable accommodation refers to "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held . . . or is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[.]"[81]  "To determine the appropriate reasonable accommodation, it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation."[82]   An employer is required to make reasonable accommodations "unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[83]

State law provides similar rights.   The Alaska Human Rights Act, AS 18.80.220(a)(1), states:

> [I]t is unlawful for an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's . . . physical or mental disability . . . when the reasonable demands of the position do not require distinction on [that] basis[.]

Ms. Walker alleges that NWP discriminated against her under these laws based on her fibromyalgia by unreasonably denying her request to continue working from

---

[80] *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012) (citing *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 994 (9th Cir. 2007)).

[81] 29 C.F.R. § 1630.2(o)(1)(ii).

[82] 29 C.F.R. § 1630.2(o)(3).

[83] 42 U.S.C. § 12112(b)(5)(A).

home three days per week and terminating her employment.[84]  She asserts that she was able to perform the essential functions of her job "and had been doing so for several years, with the accommodation of working two days per week in the office and three days per week at home."[85]  Ms. Walker also alleges that NWP refused to engage in an interactive process with her to identify a reasonable accommodation.[86]  And she maintains that "NWP has made no attempt to show . . . that [her] requested accommodation would place an undue burden or hardship on the company."[87]

NWP argues that it is entitled to summary judgment on Ms. Walker's disability discrimination claims because Ms. "Walker was not a qualified individual with a disability because she could not perform the essential functions of her job – namely, the attendance requirement of the position."[88]  NWP also contends that "the accommodation [Ms. Walker] requested – to work at home three days per week – was not reasonable because it was the schedule under which she was failing to meet performance expectations."[89]  NWP also disputes Ms. Walker's claim that it failed to engage in the interactive process, and maintains that it considered and responded to Ms. Walker's proposal and offered her a reasonable accommodation.  NWP also notes that Ms. Walker was the only employee in her position allowed to work at home, which

---

[84] Docket 7-1 at 13 (Compl. at ¶ 39).

[85] Docket 34 at 9 (Opp.).

[86] Docket 34 at 9-11 (Opp.).

[87] Docket 34 at 9, 12 (Opp.).

[88] Docket 29 at 24-25 (Mot.).

[89] Docket 29 at 24 (Mot.).

implies on-site attendance was an essential function of her position.[90]  NWP refutes Ms. Walker's claim that it must demonstrate that the particular accommodation she requested would impose an undue burden.  In this regard, it persuasively cites to *Sharpe v. American Telephone & Telegraph Co.* that "the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship."[91]

NWP cites to *Samper v. Providence Medical Center*[92] in support of its assertion that an individual that cannot meet the attendance requirement of a position is generally not a "qualified individual" and that "[e]xcept in the unusual case where an employee can perform all work-related duties at home, an employee who does not come to work cannot perform *any* of his job functions, essential or otherwise."[93]  But in *Samper*, the employee worked in a neo-natal intensive care unit in a hospital, which is clearly a very different work environment than that at issue here.  And Ms. Walker notes that unlike the nurse in *Samper*, "attendance in the NWP office a certain number of days per week was never listed in [her] job description, nor was it implied."[94]

Clearly, the record demonstrates multiple factual disputes, including the extent to which office attendance is an essential function of Ms. Walker's position, whether NWP

---

[90] Docket 38 at 15 (Reply).

[91] Docket 38 at 16 (Reply) (quoting *Sharpe v. Am. Tel. & Tel. Co.*, 66 F.3d 1045, 1050 (9th Cir. 1995) (internal citation and quotation marks omitted)).

[92] 675 F.3d 1233, 1240 (9th Cir. 2012).

[93] Docket 29 at 27 (Mot.) (citing *Samper*, 675 F.3d at 1239 (internal citations and quotations omitted)).

[94] Docket 34 at 15 (Opp.).

offered a reasonable accommodation for Ms. Walker's disability, and whether NWP adequately engaged in the interactive process.[95]   Summary judgment on this claim is accordingly denied.

### D. Claim 3: Violation of ERISA

Ms. Walker brings a claim under the Employee Retirement Income Security Act (ERISA).  Section 510 of ERISA, as codified at 29 U.S.C. § 1140, provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]

In order to prevail on her ERISA interference claim, Ms. Walker must show that NWP had "specific intent" to violate ERISA when it terminated her as "no action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination."[96]   The Ninth Circuit applies the *McDonnell Douglas* burden-shifting analysis to Section 510 ERISA claims when no direct evidence of a specific intent to interfere with ERISA rights is presented.[97]

> A plaintiff must first establish a *prima facie* case of discrimination.  If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision.  Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse

---

[95] *See Barnett v. U.S. Air*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *overruled on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2000).

[96] *Dytrt v. Mountain States Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir. 1990) (internal citations omitted).

[97] *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 457 (9th Cir. 1995) (citing *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1111-12 (2d Cir. 1988)).

Case 3:11-cv-00089-SLG   Document 45   Filed 01/28/13   Page 18 of 23

employment decision is a pretext for another motive which is discriminatory.[98]

In certain situations, the timing of a discharge may create the inference of reprisal.[99]

NWP correctly maintains that Ms. Walker has not presented "any direct evidence that NWP terminated [her] with the specific intent to interfere with any ERISA rights."[100] It also asserts that "the record is clear that [it] informed Walker that FMLA and disability leave could be taken concurrently" and that it encouraged Ms. Walker to use her benefits, conduct it maintains negates Ms. Walker's claim that it terminated her with the specific intent of precluding her from obtaining benefits.[101] Relying on its version of the events of April 9, 2009, NWP contends that Mr. Irmen and Ms. Krajnik arrived at the meeting on that day "prepared to terminate Walker if she refused to work three days per week and that decision was entirely unrelated to any benefits discussion."[102] Thus, NWP asserts that even if Ms. Walker could establish a prima facie case, her ERISA claim must fail because she was terminated for a legitimate non-ERISA reason when she refused to accept the schedule change.[103]

Ms. Walker acknowledges that NWP had explained her "right to disability insurance several times for her consideration," but she asserts it then fired her when

---

[98] *Id.* at 456 (quoting *Wallis v. J.R. Simplot. Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

[99] *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869, 881 (9th Cir. 1989).

[100] Docket 29 at 31 (Mot.).

[101] Docket 29 at 32 (Mot.); Docket 38 at 21-22 (Reply).

[102] Docket 29 at 32 (Mot.).

[103] Docket 29 at 32 (Mot.).

Case 3:11-cv-00089-SLG   Document 45   Filed 01/28/13   Page 19 of 23

she attempted to turn in her FMLA paperwork.[104]  Relying on her version of the events of April 9, 2009, Ms. Walker asserts that "the close proximity of [her] request for FMLA leave and her termination create a permissible inference" that NWP intended to interfere with her disability benefits such that its given reasons for termination are pretextual.[105]

Under the *McDonnell Douglas* burden-shifting analysis, Ms. Walker has presented sufficient evidence that NWP terminated her only when she attempted to hand in her FMLA paperwork.  NWP has alleged a legitimate reason for its action, maintaining that it terminated Ms. Walker earlier in the day when she refused to work in the office three days per week.  Thus, the burden shifts back to Ms. Walker to prove the given reason is pretextual.[106]  If the trier of fact accepted Ms. Walker's version of the events on April 9, 2009, it could find the asserted reason was pretextual.  Thus, genuine issues of material fact preclude summary judgment on this claim.

### E.  Remaining State Common Law Claims

Counts 4 through 7 are common law claims under state law.  Count 4 alleges a violation of AS 23.05.140 and was not addressed in NWP's motion.  Count 5 was dismissed by stipulated order dated June 19, 2012.[107]

Count 6 alleges a breach of the covenant of good faith and fair dealing.  Under Alaska law, the covenant of good faith and fair dealing

---

[104] Docket 34 at 27 (Opp.).

[105] Docket 34 at 27-28 (Opp.).

[106] *See Ritter*, 58 F.3d at 456-58.

[107] Docket 28.

can be breached objectively or subjectively. The objective prong of the covenant is breached when an employer fails to act in a manner that a reasonable person would consider fair, which includes treating similarly situated employees disparately, terminating employees on unconstitutional grounds, and terminating employees in violation of public policy. The subjective prong of the covenant is breached when an employer is motivated by the goal of depriving the employee of a benefit of the contract. The purpose of the covenant is to effectuate the reasonable expectations of the parties, not to alter or to add terms to the contract.[108]

Ms. Walker alleges that NWP breached this covenant by interfering with "[her] rights under the FMLA, violat[ing] provisions of the ADA and AS 18.80.220, and depriv[ing] her of benefits due under her disability benefit plans."[109] By stipulated order, the ERISA component of this cause of action relating to disability benefits was dismissed.[110]

Ms. Walker's seventh cause of action alleges a wrongful retaliatory discharge claim. She maintains that she was terminated "because of her disability" and "in order to interfere with her protected rights under the FMLA and ERISA."[111] Here again, by stipulated order the ERISA component of this cause of action relating to disability benefits has been dismissed.[112]

Under Alaska law, retaliatory discharge claims can follow different analytical frameworks depending on the type of evidence presented. When there is *no* direct evidence of retaliation [as is the case here], a pretext framework is used.[113]

---

[108] *Miller v. Safeway, Inc.*, 170 P.3d 655, 658-59 (Alaska 2007) (quoting *Witt v. State, Dep't of Corr.*, 75 P.3d 1030, 1034 (Alaska 2003)).

[109] Docket 7-1 at 19-20 (Compl.).

[110] Docket 28; *see* 29 U.S.C. § 1144 (a) (ERISA preemption clause).

[111] Docket 7-1 at 20 (Compl.).

[112] Docket 28; *see* 29 U.S.C. § 1144 (a) (ERISA preemption clause).

[113] *Reust v. Alaska Petroleum Contractors, Inc.*, 127 P.3d 807, 815 (Alaska 2005) (internal citations and grammatical marks omitted).

Under the pretext analysis, Ms. Walker must first establish a prima facie case of retaliation. In order to do so, "a plaintiff must show: (1) that the employee was engaged in a protected activity; (2) that an adverse employment decision was made; and (3) that there was a causal connection between the two."[114] "[C]ausation . . . may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge."[115] If Ms. Walker establishes a prima facie case of retaliation, the burden shifts to NWP to articulate a legitimate reason for the termination. "To satisfy this burden [of production], the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."[116] If NWP makes this showing, Ms. Walker would have the burden to prove its explanation was pretextual.

NWP's briefing contains little discussion of these claims, asserting that summary judgment is appropriate on them because they "arise out of the same conduct asserted to support her statutory claims" so that if the statutory claims "fail as a matter of law, then the state common law claims also fail."[117] But given that this Court has denied summary judgment on the FMLA and disability claims, summary judgment on the related state law claims on the record before this Court is unwarranted.

---

[114] *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 433 (Alaska 2004) (quoting *Veco, Inc. v. Rosebrock*, 970 P.2d 906, 921 (Alaska 1999)).

[115] *Id.* at 433 (Alaska 2004) (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 717, 730-31 (9th Cir. 1986)).

[116] *Id.* at 433 (Alaska 2004) (quoting *Miller,* 797 F.2d at 730-31 (internal quotation marks omitted)).

[117] Docket 29 at 33 (Mot.).

Case 3:11-cv-00089-SLG   Document 45   Filed 01/28/13   Page 22 of 23

## CONCLUSION

For the foregoing reasons, NWP's Motion for Summary Judgment at Docket 29 is DENIED.

DATED at Anchorage, Alaska this 28th day of January, 2013.

/s/ Sharon L. Gleason
United States District Judge